Filed 12/29/23  In re A.F. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION ONE

| | |
|---|---|
| In re A.F., et al., Persons Coming Under the Juvenile Court Law. | B330057 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHRISTINA S.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19CCJP07874) |

APPEAL from orders of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

In 2019, the Department of Children and Family Services (DCFS) removed A.F. (then age 5) and Me.F. (then age 2) from their parents' custody following the death of their two-month-old sibling, Mo.F. After DCFS placed the children with relative caregivers, the parents failed to visit the children consistently or to make meaningful progress with their court-ordered case plans. The juvenile court thereafter terminated parental rights to free the children for adoption by their relative caregivers, with whom they had lived for over three years.

The children's mother, Christina S. (Mother), now asks us to reverse the juvenile court's order terminating her parental rights. She argues the court erred in failing to apply the parental-benefit exception set forth in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1] That exception bars the termination of parental rights where a parent establishes: "(1) regular *visitation and contact* [with the child], (2) a *relationship* [with the child], the continuation of which would benefit the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*), citing § 366.26, subd. (c)(1)(B)(i).) Mother urges that she established "regular visitation" and that the juvenile court improperly obstructed her ability to prove the exception's two remaining requirements by denying her request to present testimony from A.F. at the parental rights termination hearing.

We conclude, however, (1) the record demonstrates that Mother failed to establish the requisite "regular visitation," (2) we need not reach the merits of Mother's argument concerning

---

[1] Subsequent statutory references are to the Welfare and Institutions Code.

2

the exclusion of A.F.'s testimony, and (3) even were we to do so, Mother would not be entitled to relief. We therefore affirm.

## FACTUAL AND PROCEDURAL SUMMARY[2]

A.F. and Me.F. came to DCFS's attention on December 6, 2019, when their two-month-old sibling, Mo.F., suffocated underneath a blanket on a sofa in the family home. Mother and Michael F. (Father) had left the three children unattended for several hours while they smoked marijuana in another room. The parents delayed significantly in calling 911, and the baby arrived at the hospital after she had been unresponsive for over two hours.

DCFS's subsequent investigation culminated in the filing of a section 300 petition on behalf of A.F. and Me.F. on December 10, 2019. The petition alleged that Father had physically abused Mo.F., and that both parents had placed all three children "in a detrimental and endangering situation" by "fail[ing] to provide . . . proper care and supervision." The petition alleged further that both parents had histories of substance abuse and actively abused marijuana, and that Mother failed to take prescribed psychotropic medications for her diagnosed depression and anxiety. Finally, the petition alleged that the parents maintained "a filthy, unsanitary and hazardous home environment," which included the presence of electrical wires on the floor that ran to a marijuana growing operation in the back of the house. DCFS later filed an amended petition that added an allegation that Father had sexually abused A.F.

---

[2] We limit our summary to the facts and procedural history relevant to the issues Mother raises on appeal. Father is not a party to this appeal, and we therefore discuss his involvement in the dependency proceedings only to the extent relevant to Mother's claims.

DCFS placed the children with a maternal great aunt and uncle. The caregivers adeptly managed the children's special needs, and the children thrived in the placement. The symptoms associated with A.F.'s diagnoses of attention deficit hyperactivity disorder, post-traumatic stress disorder, and pica improved over time. Similarly, certain developmental issues associated with Me.F.'s autism diagnosis also improved; for example, she began to communicate verbally more frequently. The caregivers expressed interest in adopting the children.

Over the course of the three-and-a-half-year dependency proceedings, Mother failed to visit the children consistently. At the December 11, 2019 detention hearing, the court granted Mother monitored visits three times per week. Initially, Mother visited the children regularly. In November 2021, however, the caregivers and children moved from Los Angeles to Murietta, California. Following the move, Mother's visits decreased significantly. DCFS reported that, despite providing Mother approximately $900 in transportation funds, she visited the children no more than six times throughout 2022. In addition, at the conclusion of one such visit, the relative caregiver reported that Mother pressured her to write a letter to the juvenile court falsely stating that Mother had been visiting and calling the children regularly. Mother also declined to participate in A.F.'s April 2022 individualized education program meeting.

On September 12, 2022, the juvenile court terminated Mother's reunification services due to her failure to make adequate progress with her court-ordered case plan. After the court terminated services, Mother began calling the children three times a week. DCFS reported, however, that Mother sometimes made inappropriate statements during the calls. For example, A.F.'s therapist reported that, during one call, Mother told A.F.

4

that Me.F. had caused Mo.F.'s death by sitting on the baby's chest. In addition, the children's therapist reported that Mother's calls appeared to induce emotional distress in both children. A.F.'s therapist noted, for example, that her "most recent response to the calls was an act resulting in near loss of a finger, where she tied her middle finger with a rubber band for a long period of time causing loss of circulation, medical attention, and several hospital and urgent care visits."

In December 2022, Mother moved to Ohio. She had given birth to another baby in May 2022, and explained the move to Ohio would allow her to obtain affordable housing and additional support. The move made it more difficult for Mother to see A.F. and Me.F. in person, and she visited the children only twice between January and June 2023.

Based on Mother's sporadic visitation record and failure to make progress with her case plan, DCFS recommended termination of parental rights pursuant to section 366.26. In support of its recommendation, DCFS submitted several reports, including a March 15, 2023 addendum report describing a February 15, 2023 meeting between an adoption social worker and the children. During the meeting, the social worker "spoke to [A.F.] about adoption in an age[-]appropriate manner. [A.F.] reported she likes living with the [relative caregivers] and feel[s] safe. . . . [Me.F.] [was] too young to provide a meaningful statement regarding adoption[, but] . . . did report she like[s] living in the home."

After several continuances, the section 366.26 hearing commenced on May 31, 2023. Mother argued that the parental-benefit exception applied to bar termination of her parental rights. She testified concerning her bond with the children and claimed the relative caregivers made it difficult for her to participate in telephone calls with the children. Children's

5

Social Worker (CSW) Joe Eisenfeld also testified, contradicting Mother's testimony that the caregivers obstructed Mother's efforts to contact the children. In addition, CSW Eisenfeld testified concerning the children's wishes for their permanent plan:

"[CSW Eisenfeld:] The children are young and the youngest child is autistic, so there is a limit to their understanding of the difference of the permanent plan. They understand that their mother is their mother and always will be their mother, but they have made statements that they are comfortable where they are, and they have made negative statements, at least [A.F.] made negative statements about the mother's home. . . . She keeps on making statements about the filth in the home, the rodents in the home, those things are still coming up two or three years after detention.

"[¶] . . . [¶]

"The Court: . . . You asked [A.F.] if she wanted the [caregivers'] home to be a forever home?

"[CSW Eisenfeld]: Yes. Yes, Your Honor.

"The Court: All right. And what was her answer?

"[CSW Eisenfeld]: She said 'yes,' Your Honor."

At the conclusion of CSW Eisenfeld's testimony, the court continued the remainder of the section 366.26 hearing to June 13, 2023.

On June 9, 2023, DCFS submitted a last minute information filing to the court reiterating CSW Eisenfeld's testimony that the children were in favor of remaining in their current placement. The filing noted that CSW Eisenfeld "ha[d] not observed during visits that the children ask about their mother or request phone or in-person contact from her." Instead, when CSW Eisenfeld asked about Mother, the children "consistently responded with ambivalence." In addition, the filing noted that, during CSW Eisenfeld's visits to the caregivers' home, A.F. "stated that she

6

was in support of [the] plan to remain in [the] care of her relative caregivers permanently."

At approximately 5:00 p.m. on June 12, 2023, Mother's counsel emailed the children's counsel to request for the very first time that A.F.—then eight years old—testify at the continued section 366.26 hearing set for the next day. Mother's counsel reiterated her request for A.F.'s testimony at the outset of the June 13 hearing, arguing that DCFS's June 9 filing contained new information concerning the children's purported "ambivalen[ce]" toward Mother. Mother's counsel argued that earlier reports contained "conflicting information [that] . . . the children get upset when they can't visit the Mother[3]. . . . So I do believe that the court should entertain some testimony about what exactly these children feel when it comes to this." Children's counsel opposed the request as untimely and unreasonable, but cited no authority in support of its position.

The juvenile court therefore took a brief recess to conduct its own legal research on the issue. It then resumed the proceedings and denied Mother's request for A.F.'s testimony, explaining:

"I do not think that, given everything this child has been through in this case, and the totality of the circumstances, and the late request for this examination, that it is warranted, and I

---

[3] For example, in a May 2022 report, DCFS informed the court that "[w]hen asked directly by [a social worker] if she want[ed] to return to her parents, [then-]seven-year[-]old [A.F.] state[d] that she [did] indeed want to return to her mother and father. However, it is worth noting, that if not solicited with this question, [A.F.] [did] not ask about her father or mother. Further, she [did] not exhibit any distress about separation from her parents [nor] lack of visits or phone calls from her parents."

am going to deny the request.  I don't think it's—I don't think it's a denial of due process.  I think this child would be traumatized. She's already been traumatized enough during this hearing, and Mother—we don't even get to the first prong[,] as far [as] this court is [concerned][,] of *Caden C.*, because visitation has not been consistent.  Whatever visitation—Mother chose to move out of the area.  She's not had in-person visits with the children.  After [termination of reunification services] and she was facing the potential of having [her parental] rights terminated, she did start having some video visitation with her, but that—the fact that those are video was all Mother's doing.  She chose to move out of the area and that was her choice.  The visitation has not been, in the court's view, beneficial or consistent, . . . and I don't think that asking the child—telling the child the difference between legal guardianship and adoption would be fruitful.  The request is late, and at some point the child deserves permanency."

The court then concluded the parental-benefit exception did not apply and terminated Mother's parental rights.

Mother timely appealed.

## DISCUSSION

Mother contends the trial court erred in terminating her parental rights at the section 366.26 hearing because (1) she proved the "regular visitation" requirement, and (2) the court's purportedly incorrect decision to exclude A.F.'s testimony prevented her from establishing the two other requirements of the parental-benefit exception.

### A.    *Applicable Law and Standard of Review*

The parental-benefit exception set forth in section 366.26, subdivision (c)(1)(B)(i) is "an exception to the presumptive rule of

terminating parental rights after reunification efforts have failed, in order to free a child for adoption." (See *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1067 (*Eli B.*), boldface & underscoring omitted.) "It applies where '[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' " (*Caden C., supra*, 11 Cal.5th at p. 631, quoting § 366.26, subd. (c)(1)(B)(i).) The parent therefore must prove: "(1) regular *visitation and contact*, (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra,* at p. 631.)

We review a juvenile court's findings with respect to "regular visitation" for substantial evidence. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.) "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' [Citations.]" (*Ibid.*)

### B.    *The Juvenile Court Properly Concluded the Parental-Benefit Exception Does Not Apply*

Mother argues the juvenile court erred by refusing to apply the parental-benefit exception. The record, however, contains substantial evidence supporting the court's determination that

9

Mother failed to establish the requisite "regular visitation."[4] (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

The visitation requirement "is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) " ' " 'Sporadic visitation is insufficient.' " ' " (*In re I.E.* (2023) 91 Cal.App.5th 683, 691 (*I.E.*).) The record here reflects that Mother did not consistently visit the children. Instead, Mother's in-person visits became less frequent over time, notwithstanding that DCFS provided her with nearly $900 in transportation funds. In addition, the record indicates that—although Mother telephoned more frequently following the termination of reunification services—she called the children only sporadically over the course of the three-and-a-half-year proceedings. Substantial evidence thus supports the court's finding that Mother failed to maintain regular visitation and contact with the children. (See *Eli B.*, *supra*, 73 Cal.App.5th at p. 1070 [" 'regular visitation' " not established where "[the] father's visitation with his children throughout the years-long dependency proceeding was sporadic and also entailed significant gaps"]; *In re Breanna S.* (2017) 8 Cal.App.5th 636, 647 [affirming order terminating parental rights where there was "ample" evidence parent visited "only sporadically during the first 18 months of the dependency proceedings" even though visits became more regular during final six months before section 366.26 hearing], disapproved

---

[4] Mother contends "the juvenile court seemed to find [she] met the element 'of regular visitation and contact.' " Mother is mistaken. In denying her request to present testimony from A.F., the court stated expressly that Mother's "visitation ha[d] not been . . . beneficial or consistent."

on other grounds in *Caden C., supra*, 11 Cal.5th at pp. 637, fn. 6 & 638–639, fn. 7.)

Because Mother failed to prove "regular visitation," we need not resolve whether exclusion of A.F.'s testimony improperly prevented Mother from establishing the two remaining requirements of the exception.  Even were we to reach Mother's argument on this issue, however, we would reject it.

The juvenile court has a "mandatory duty . . . to 'consider the child's wishes to the extent ascertainable' prior to entering an order terminating parental rights."  (*In re Leo M.* (1993) 19 Cal.App.4th 1583, 1591; see § 366.26, subd. (h)(1) ["[a]t all proceedings under this section, the court shall consider the wishes of the child and shall act in the best interests of the child"].)  The court nonetheless "can, consistent with a parent's due process rights, refuse to compel the testimony of a child who is otherwise available when 'the possible benefit derivable from [the] testimony would not warrant the [psychological] injury it would cause.' [Citation.]"  (*In re Daniela G.* (2018) 23 Cal.App.5th 1083, 1086 (*Daniela G.*); see *In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1089.)  "The child's testimony can properly be excluded where 'the child's desires and wishes can be directly presented without live testimony, where the issues to be resolved would not be materially affected by the child's testimony, and where it is shown that the child would be psychologically damaged by being required to testify.'  [Citations.]"  (*Daniela G., supra*, 23 Cal.App.5th at p. 1092.)

Here, DCFS presented evidence concerning A.F.'s wishes for permanency through statements she made to the adoption social worker in February 2023, as well as through CSW Eisenfeld's live testimony at the section 366.26 hearing.  (*I.E., supra*, 91 Cal.App.5th at p. 694 [" '[e]vidence of a child's wishes may, but need not, be in the form of direct testimony at the parental rights

11

termination hearing; such evidence may also appear in [DCFS's] reports' "].)

Moreover, Mother does not argue that A.F. would have provided testimony relevant to the "regular visitation" requirement of the parental-benefit exception. The excluded testimony therefore would not have "materially affected" the court's determination that Mother had failed to prove the first requirement of the exception and, by extension, the exception's overall applicability. (*Daniela G.*, *supra*, 23 Cal.App.5th at p. 1092.)

Finally, evidence in the record—including a letter from A.F.'s therapist—documenting the eight-year-old's special needs and emotional distress following telephone calls with Mother supports the court's finding that requiring the child to testify would have caused her psychological trauma. (See *Daniela G., supra,* 23 Cal.App.5th at pp. 1088, 1095 [rejecting argument that a medical expert opinion is required to establish a child would be traumatized by testifying].)

Accordingly, we conclude the juvenile court did not err in rejecting Mother's arguments concerning the parental-benefit exception.

## DISPOSITION

The orders Mother challenges on appeal are affirmed. <u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, P. J.

We concur:



CHANEY, J.



BENDIX, J.